UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.:

JAMES DIXON,

    Plaintiff,

v.

BAKER-HILL INDUSTRIES, INC., a
Florida corporation, and MATTHEW RICCI,
an individual,

    Defendants.
_____/

## **COMPLAINT**

Plaintiff, James Dixon ("Dixon"), through his undersigned attorneys, files this Complaint against the Defendants, Baker-Hill Industries, Inc. and Matthew Ricci (hereinafter, "Defendant"), and alleges:

## **JURISDICTION AND VENUE**

1. This suit is brought against the Defendant pursuant to 29 U.S.C. § 201 *et seq.* ("Fair Labor Standards Act" or "FLSA").

2. Jurisdiction is conferred upon this Court by:

    (a)    28 U.S.C. § 1331;

    (b)    28 U.S.C. § 1343; and

    (c)    29 U.S.C. § 216(b), which allows for a FLSA claim to be brought in any court of competent jurisdiction.

3. Venue is proper for the Southern District of Florida because:

  (a) Dixon was employed in the Southern District of Florida by the corporate Defendant which at all material times conducted, and continues to conduct, business in Broward County; and

  (b) Additionally, venue lies because the acts that gave rise to Plaintiff's claims occurred in the Southern District of Florida and because the corporate Defendant keeps an office for the transaction of its customary business in this district (Baker-Hill Industries, Inc. is headquartered in Broward County, and Matthew Ricci resides in Broward County).

## CONDITIONS PRECEDENT/ADMINISTRATIVE EXHAUSTION

4. Plaintiff has complied with all conditions precedent in this case, or they have been waived. A pretrial demand letter was sent, and significant steps were made toward resolution of this matter presuit.

## PARTIES

5. Dixon is a citizen of the State of Florida and resides therein.

6. Defendant Baker-Hill Industries, Inc. is a Florida corporation which, at all times material, conducted substantial and continuous business in this judicial district, and is subject to the laws of the State of Florida and the United States. Baker-Hill Industries, Inc. owns and operates a engineering company in Coral Springs, Florida at which for all material times Dixon worked for and his labor benefited.

7. The corporate Defendant paid employees and paid Dixon (through Ricci) and has gross annual sales volume that greatly exceeds $500,000 annually, at least for years 2017-20. The corporate Defendant has two or more employees engaged in commerce, as they have two or more employees who handle, work on, and use goods or materials that have been moved in interstate commerce and/or manufactured outside the state of Florida. For example, in the South Florida location Defendant has at least 15 employees two or more who use computers, computer software,

office supplies, copiers which were manufactured outside the State of Florida (and thus have moved in interstate commerce), and use cars and vehicles that in turn use gasoline, which vehicles and gasoline were manufactured outside the State of Florida. Further, the Defendant has various employees make long distance phone calls (suppliers, internet purchases, and others) and sent emails to individuals who reside out of the State of Florida regularly and recurrently to effectively communicate for the businesses to operate.

8. Additionally, Dixon is entitled to individual coverage, as he regularly and recurrently made calls to vendors, suppliers, prospective customers, and customers across state lines and thus he participated in the actual movements of goods or services and commerce across state lines.

9. Individual Defendant Ricci was the CEO of the corporate Defendant and operates it day-to-day and has operational control over the corporate Defendant deciding all financial decisions and having say over numerous employees and directing their work day-to-day, including how much they would be paid and when they would be paid, as the individual Defendant had the power the hire and fire, daily managed the company and was ultimately responsible for the profitability of the business.

10. Concerning Dixon, Defendant Ricci was involved in Dixon's hire, told him what to do day-to-day, determined how much and whether he would be paid, and Dixon had to follow the individual Defendant's orders.

11. The corporate Defendant is an "employer" pursuant to 29 U.S.C. § 203(d) of the Fair Labor Standards Act, and so too is the individual Defendant.

12. The corporate Defendant is an "enterprise" pursuant to 29 U.S.C. § 203(r) of the Fair Labor Standards Act.

The corporate Defendant is an enterprise "engaged in commerce" pursuant to 29 U.S.C. § 203(s) of the Fair Labor Standards Act. During all times relevant to this action, the corporate Defendant was an enterprise engaged in commerce as defined in 29 U.S.C. §§ 203(r) and 203(s).

13. Dixon was an "employee" pursuant to 29 U.S.C. § 203(e)(1) of the Fair Labor Standards Act.

14. Dixon was a non-exempt employee of Defendant who was subject to the payroll practices and procedures described in Paragraphs 23, 24, and 25 below, and who worked in excess of forty (40) hours during one or more workweeks within three (3) years of the filing of this Complaint. At all times pertinent to this Complaint, Defendant failed to comply with 29 U.S.C. §§ 201-219 in that Dixon performed services for Defendant for which no provision was made to properly pay for those hours in which overtime was required to be paid, which requires the payment of wages at time and one-half for all hours worked in excess of forty (40) hours in each workweek.

## STATEMENT OF FACTS

15. Within the past three (3) years (July 2016 to August 2020), Dixon worked for the Defendant performing various duties. The Defendant is in the manufacturing industry for aerospace. Though Dixon's offer letter stated that he was hired as a "Manufacturing Supervisor", he did not perform those duties, nor were they in a job description. Instead, Dixon was referred to as a "Manufacturing Manager" to start. Then, the position titled "Continuous Improvement Manager". Once Dixon was changed to a Continuous Improvement Manager, in or about early 2017, Dixon did not manage as he did not supervise 2 or more full-time employees and he did not have the ability to hire or fire or make effective recommendation concerning hiring or firing, and he worked alone. At all times, Dixon performed his job adequately and was always a full-time employee. At the time Dixon started with Defendant, the Defendant's monthly sales were

approximately $725,000/mo., but a few months before Dixon was terminated, the Defendant's monthly sales were $1,200,000 - $1,400,000/mo.

In late November 2019, Dixon received a bonus significantly less than in the past, despite the Defendant's much lower sales and profit margins prior to Dixon's arrival, which prompted Dixon to request a meeting with Defendant Ricci who was the CEO to whom Dixon reported. Dixon was told that he had been removed from the management bonus program in early 2018 (though Dixon had no advance notice or was even being told at the time). Ricci told Dixon that Dixon was no longer part of the management bonus incentive program (as of the start of 2018, apparently it coincided with Dixon's title change to Continuous Improvement Manager), though Dixon was never told this before and thus worked for over 2 years not knowing this.

Ricci stated that the fact Dixon did not have any direct reports since the change in 2018 meant Dixon no longer qualified to be in the management bonus program despite Dixon's title. Thus, Defendant misled (it constitutes tortious misrepresentation) Dixon into believing that Dixon qualified for the program to incentivize Dixon to work long hours, all the while having in place a scheme that prevented Dixon from ever financially benefitting from his work, because Dixon neither qualified for the bonus program nor was paid overtime. Because the Defendant did not inform Dixon of being taken out of the bonus program but leading Dixon to believe he qualified for it, Dixon worked countless hours throughout 2017, 2018, 2019, and the first 8 months of 2020, but was neither given the bonus nor paid any overtime despite being non-exempt, all he was paid was a certain sum of money for the first 40 hours worked. There were countless hours spent by Dixon creating advanced complex excel tracking/training spreadsheets, formal work instructions, creating and revising Standard Operating Procedures, creating safety/training documents, PowerPoint Presentations, company sales brochures, etc., that no one had the skill or desire to learn or create.

16. Dixon's duties included doing whatever task the Defendant instructed him to perform, which varied depending the time, but most of those tasks are described above.

17. Dixon did not have the ability to hire or fire anyone (nor did he hire or fire anyone), and he did not regularly and customarily direct the work of any employees, much less two or more full-time workers.

18. Dixon was only given tasks that were designed to facilitate production work of the Defendant, such as the tasks described above, all of which consisted of regular, recurrent, and routine work that did not involve him exercising independent judgment and discretion on matters of significance.

19. Dixon's primary duties were not management.

20. During Dixon's employment, Dixon did not have any authority to interview, select, and/or train employees. Dixon did not have any authority to set and adjust the rates of pay and hours of work for any employees. Dixon had no authority to direct the work of employees. Dixon did not maintain production or sales records at all when he worked for the Defendant, nor did he use any such records to supervise or control any employee. In fact, Dixon knows little about the business's financing or financial success or failure, other than it was grossing about $725,000/mo. when he started and about $1,300,000/mo. when he was fired. The finances were not his ultimate responsibility. Dixon did not supervise any staff. Dixon had absolutely no say concerning any of the costs. For example, concerning wages paid to employees, Dixon had no say concerning what any particular employee would be paid, how many employees could work in the buildings, when, what hours they could work, whether their pay should be increased or decreased, as all of that was determined by the Defendants. Dixon had no authority to spend any of the Defendant's money at all, and had no authority to authorize the payment of bills. Dixon never opened up any mail that

came to the building for purposes of making any decision concerning the business with respect to that mail.

21. While Dixon worked for the Defendants, he never appraised employees' productivity and/or efficiency for the purpose of recommending promotions or other changes in status. While Dixon worked for the Defendants his last two years, he never handled employee complaints and grievances, as that was for the Defendants to do. Also, Dixon never disciplined employees, nor did he have the power or authority to do that. Dixon did not plan any work for any employee, as there was no work to plan. Dixon never determined any techniques to be used by employees to do their job. Dixon never apportioned work among any employees, as there were no employees who reported to him to whom to apportion work. Dixon never determined the type of materials, supplies, machinery, equipment, or tools to be used by any employees, as the Defendants or the employees themselves decided all of that. Dixon had no involvement in controlling the flow and distribution of materials or merchandise and supplies. Dixon had nothing whatsoever to do with materials, merchandise, or supplies or their distribution. Dixon had no involvement with respect to budgeting. Dixon was not involved in reviewing any sort of financial documents or statements regarding the physical plant, and he did not review any such documents, nor was Dixon supposed to. Dixon had no involvement in monitoring or implementing legal compliance measures. There were no legal issues that Dixon had anything to do with in terms of deciding how they would be handled or dealt with while he worked for Defendant, nor did he have anything to do with paperwork concerning new employees or hires. Dixon simply followed the established techniques and procedures with respect to his duties, all of which were repetitive, routine, and recurrent work.

22. Dixon did not do anything that could have resulted in financial losses for the Defendants. Dixon did not perform work that was directly related to management or general

business operations of Defendants or their customers, because Dixon did not perform work directly related to assisting with the running or servicing of the business, but rather was engaging in production work (preparing items that would increase sales and generate more money, and work arising out of that, communications with co-workers). Dixon also did not perform work directly related to the management or general business operations of the Defendants because Dixon did not work in a functional area such as tax; finance; accounting; budgeting; auditing; insurance; quality control; purchasing; procurement; advertising; marketing; research; safety and health; personnel management; human resources; employee benefits; labor relations; public relations, government relations; computer network, internet and database administration; legal and regulatory compliance; and similar activities. Rather, Dixon was one more person looking to perform production work the Defendants rely on so heavily, assist with the production work of increasing monies an aerospace company was earning.

23. In the course of employment with Defendant, Dixon worked the number of hours required of him, but were not paid time and one-half for all hours worked in excess of forty (40) during a workweek.

24. Dixon regularly worked in excess of forty (40) hours per workweek—50-70 hours per week on average.

25. The Defendant should have partial accurate records of hours worked, because it required Dixon to login on a computer (though he was given tasks and worked off of the clock when instructed to).

26. Dixon has retained the undersigned legal counsel to prosecute this action in his behalf, and has agreed to pay them a reasonable fee for their services.

27. Dixon is entitled to his reasonable attorneys' fees for prosecuting this action, whether or not he is the prevailing party.

## COUNT I – RECOVERY OF OVERTIME COMPENSATION

28. Dixon re-adopts, incorporates by reference, and re-alleges Paragraphs 1 through 27 above as though fully set forth.

29. Dixon is entitled to be paid time and one-half for each hour worked in excess of forty (40) in each workweek.

30. By reason of the intentional, willful, and unlawful acts of Defendant, Dixon has suffered damages, *e.g.*, back pay for overtime wages, liquidated damages, and compensatory damages, plus incurring costs and reasonable attorneys' fees.

31. As a result of the Defendant's willful violations of the Act, and the failure to pay overtime which was not in good faith, as discussed above, Dixon is entitled to liquidated damages as provided in § 216 of the FLSA, and is entitled to recover damages for three (3) years.

WHEREFORE, for workweeks within three (3) years of the filing of this Complaint, Dixon demands judgment against Defendants for the wages and overtime payments due him for the hours worked by him for which he has not been properly compensated (back pay), liquidated damages, reasonable attorneys' fees and costs of suit, and for all proper relief including pre-judgment interest, and any further relief that the Court deems necessary.

## **DEMAND FOR TRIAL BY JURY**

Plaintiff demands trial by jury on all issues and all counts of this Complaint so triable as a matter of right.

Dated: ___March 9, 2021_____

                                    Respectfully submitted,

                                    By: /s/  *Chris Kleppin*_____
                                          Chris Kleppin
                                          Fla. Bar No. 625485
                                          ckleppin@gkemploymentlaw.com
                                          The Kleppin Firm, P.A.
                                          *Attorneys for Plaintiff*
                                          8751 W. Broward Blvd.
                                          Suite 105
                                          Plantation, FL 33324
                                          Tel. (954) 424-1933
                                          Fax (954) 474-7405
Secondary E-Mails:   assistant@gkemploymentlaw.com